[No. B193575. Second Dist., Div. Five. May 21, 2007.]

EFUND CAPITAL PARTNERS, Plaintiff and Respondent, v.
ROBERT PLESS et al., Defendants and Appellants.

COUNSEL

Quintana Law Group, Andres F. Quintana, John M. Houkom and Daniel J. Taylor for Defendants and Appellants.

Osher & Osher, Jeremy J. Osher; Law Offices of Boren & Luftman and Stephen Z. Boren for Plaintiff and Respondent.

OPINION

**TURNER, P. J.—**

## I. INTRODUCTION

Defendants, Robert Pless, Frank Mayor, David Allegra, Janice Doyle, and AIM Group, LLC (AIM), appeal from an August 28, 2006 order denying their motion to compel arbitration. The trial court denied the motion to compel arbitration explicitly relying on two decisions of the Ninth Circuit Court of Appeals—*Tracer Research v. Nat. Environ. Services Co.* (9th Cir. 1994) 42 F.3d 1292, 1294–1295, and *Mediterranean Enterprises, Inc. v. Ssangyong* (9th Cir. 1983) 708 F.2d 1458, 1461–1464—which now constitute a distinctly minority analysis. We conclude that under California law, as well as the views of all of the circuits which have considered the arbitrability issue at hand, that the motion to compel arbitration should have been granted. Thus, we reverse the order denying the motion to compel arbitration. But the trial court did not rule on plaintiff EFund Capital Partners's waiver and standing contentions. We accede to the parties' request that, upon issuance of the remittitur, the trial court is to rule on plaintiff waiver and standing contentions.

## II. BACKGROUND

### A. The Second Amended Complaint

This is in part a shareholder derivative suit. Plaintiff sues on its own behalf, and derivatively on behalf of nominal defendant RAP Technologies, Inc., doing business as Loan Vibe (RAP Technologies). Plaintiff is "a private equity firm" that finances and restructures companies. The nominal defendant, RAP Technologies, develops and distributes computer software. RAP Technologies's shareholders include: plaintiff, 42 percent; Mr. Pless, 20 percent; Mr. Allegra, 17.5 percent; and Mr. Mayor, 14 percent.

The operative pleading is a second amended complaint dated May 12, 2006. Plaintiff alleges as follows. Mr. Pless developed a mortgage presentation software program, Loan Vibe, designed for use in the mortgage loan industry. RAP Technologies was incorporated in January 2004 to develop the Loan Vibe software program. The Loan Vibe software program is RAP Technologies's primary asset. Mr. Pless became RAP Technologies's chief executive officer and director. Mr. Mayor and Mr. Allegra were the primary investors in RAP Technologies at the time of its formation. Mr. Mayor is also the managing member of defendant AIM, which is in the business of Internet Web hosting. Mr. Pless, Mr. Mayor, and Mr. Allegra held themselves out to the public as members of RAP Technologies's board of directors. Ms. Doyle had been a RAP Technologies employee and then an independent contractor. She is currently working for Mr. Pless, Mr. Mayor, and AIM.

Shortly after RAP Technologies incorporated, Mr. Pless, Mr. Mayor, and Mr. Allegra found themselves in need of capital to develop the Loan Vibe software program. They formed a plan to fraudulently induce third parties to invest in RAP Technologies. They intended to use the funds to exploit the Loan Vibe software program for their own financial gain to the exclusion of their investors. Mr. Pless approached plaintiff. (The second amended complaint does not specify the persons employed by plaintiff who were approached by Mr. Pless.) Mr. Pless represented to plaintiff that: the Loan Vibe software program had great economic potential; any investor in RAP Technologies would become a long-term partner in its growth; in exchange for plaintiff's financial backing, it would have the right to appoint directors to RAP Technologies's board; further, plaintiff would be entitled to participate in RAP Technologies's management and control, including efforts to develop, market, and exploit the Loan Vibe software program. Plaintiff, in reasonable reliance on the foregoing representations, agreed to invest in RAP Technologies.

On April 15, 2004, plaintiff entered into a contract, the "strategic relationship agreement," with RAP Technologies. The strategic relationship agreement sets forth the parties' obligations to each other. The purpose of the agreement was to initiate and further a working relationship between plaintiff and RAP Technologies. Plaintiff was to provide RAP Technologies with capital and restructuring services. In return, plaintiff would receive an equity interest in RAP Technologies. RAP Technologies was to, among other things, provide to plaintiff a copy of the Loan Vibe software program including codes and trade secrets. Further, RAP Technologies was obligated to provide to plaintiff a full list of the investors in the Loan Vibe software program. The strategic relationship agreement stated in part, "Robert Pless agrees to provide any and all services required to fulfill any agreement that is signed on behalf of RAP [Technologies] and any other duties that may arise in the course of business . . . ." Mr. Pless signed the strategic relationship agreement

in the following manner: "RAP TECHNOLOGIES, INC. [¶] [signature] [¶] By: Robert Pless [¶] Title: President & CEO." Plaintiff invested more than $500,000 in RAP Technologies. RAP Technologies was obligated to repay plaintiff with interest.

In or around April 2004, plaintiff named its managing member, Mr. Evans, and its secretary, Mr. Conrad, to RAP Technologies's board of directors. Mr. Pless served as the third RAP Technologies director. By agreement among the parties, RAP Technologies's directors were Mr. Conrad, Mr. Evans, and Mr. Pless. Also on April 15, 2004—the date the parties entered into the strategic relationship agreement—RAP Technologies entered into a contract with defendant, Integrated Tech, Inc. (Integrated). Integrated is not a party to this appeal. Integrated agreed to provide program development, service, training, and general computer programming support work for the Loan Vibe software program.

On November 7, 2005, plaintiff learned Mr. Pless had misappropriated funds from RAP Technologies. On or about November 11, 2005, Mr. Evans and Mr. Conrad, as a majority of RAP Technologies's directors, terminated Mr. Pless as chief executive officer and director. Also, on November 11, 2005, Mr. Evans notified Integrated that Mr. Pless should have no access to RAP Technologies's property. As noted, Integrated and RAP Technologies had an agreement to develop the Loan Vibe software program. Integrated had possession of RAP Technologies's property. On November 24, 2005, Mr. Evans and Mr. Conrad demanded Mr. Pless return all RAP Technologies property in his control. As of the date of the filing of the second amended complaint, Mr. Pless had not complied with the demands of Mr. Conrad and Mr. Evans. On or about November 30, 2005, Mr. Mayor agreed to provide Mr. Pless with $8,000. The $8,000 was to allow Mr. Pless to meet his personal obligations. In return, Mr. Pless agreed to divert payments from RAP Technologies's clients to AIM. As noted above, Mr. Mayor is the managing member of AIM. Thereafter, Mr. Pless caused funds due to RAP Technologies to be diverted to AIM. Further, Integrated has refused to grant RAP Technologies or plaintiff access to the Loan Vibe software program. Instead, Integrated has continued to provide defendants with "program development, service, training, and general programming support work" for the Loan Vibe software program. According to the second amended complaint: defendants had entered into additional Web hosting agreements with other entities, thereby diverting the Loan Vibe software program; these entities refused plaintiff access to the Loan Vibe software program; defendants have diverted the Loan Vibe software program to their own use; defendants have refused to provide RAP Technologies with access to the Loan Vibe software program; defendants are exploiting the Loan Vibe software program for their own financial gain to the detriment of plaintiff and RAP Technologies; and plaintiff was contractually entitled to a return on the investment in RAP

Technologies resulting from the April 15, 2004 strategic relationship agreement. However, RAP Technologies has not paid interest to plaintiff and does not have the ability to do so.

With respect to the capacity in which the defendants acted, the second amended complaint alleges: "At the time [Mr. Pless, Mr. Mayor, and Mr. Allegra] conspired to defraud [plaintiff] . . . these Defendants were acting as the Officers and Directors of RAP [Technologies] . . . [¶] Moreover, at the time that [Mr. Pless], with the assistance of and in concert with Defendants [Mr. Mayor, AIM, and Mr. Allegra] converted RAP [Technologies's] money and property, including the [Loan Vibe] Program, [Mr. Pless] was both the Chief Executive Officer and a Director of RAP [Technologies]." In addition, plaintiff alleges: "At all times mentioned herein, [defendants], and each of them, were the agent, employee and representative of each and every other [defendant], and in doing the things hereinafter alleged, each was acting within the course and scope of such agency, service and representation and directed, aided and abetted, authorized or ratified each and every unlawful act and/or omission hereinafter alleged."

Plaintiff's second amended complaint asserts causes of action for fraud, conspiracy to defraud, negligent misrepresentation, fiduciary duty breach, intentional interference with contractual relations, conversion, and declaratory relief. More specifically, it is alleged Mr. Pless either fraudulently or negligently induced plaintiff to invest in RAP Technologies. Plaintiff further alleges Mr. Pless, Mr. Mayor, and Mr. Allegra, as RAP Technologies's directors, allegedly breached their fiduciary duties by usurping the Loan Vibe program for their own personal benefit. Further, plaintiff alleged defendants intentionally interfered with the strategic relationship agreement between plaintiff and RAP Technologies. Additionally, Mr. Pless, Ms. Doyle, Mr. Allegra, Mr. Mayor, and AIM allegedly converted RAP Technologies's property. Plaintiff sought declaratory relief as to the parties' rights and ownership interests in and to the Loan Vibe software program.

### B. The Arbitration Clause of the Strategic Relationship Agreement

The strategic relationship agreement between plaintiff and RAP Technologies contains an arbitration clause which states: "Any dispute or other disagreement arising from or out of this Consulting Agreement shall be submitted to arbitration under the rules of the American Arbitration Association and the decision of the arbitrator(s) shall be enforceable in any court having jurisdiction thereof. Arbitration shall occur only in Los Angeles, CA. The interpretation and enforcement of this Agreement shall be governed by California Law as applied to residents of the State of California relating to contracts

exercised in and to be performed solely within the State of California. In the event any dispute is arbitrated, the prevailing Party (as determined by the arbitrator(s)) shall be entitled to recovery [of] that Party's·reasonable·attorney's fees incurred (as determined by the arbitrator(s))."

## C. Defendants' Motion to Compel Arbitration

On June 19, 2006, defendants moved to compel arbitration. Defendants asserted all of plaintiff's claims arose out of the business relationship founded on the April 15, 2004 strategic relationship agreement and therefore were governed by that contract's arbitration clause. Defendants presented evidence Mr. Pless was a shareholder of RAP Technologies and he had signed the April 15, 2004 strategic relationship agreement. Further, there was evidence Mr. Mayor and Mr. Allegra were also RAP Technologies shareholders. Finally, evidence was presented Integrated did not object to the motion to compel arbitration.

Plaintiff opposed the motion to compel arbitration. Plaintiff argued: defendants were not signatories to the April 15, 2004 strategic relationship agreement; they were not third party beneficiaries thereof; they were not agents of RAP Technologies; therefore, defendants could not enforce the arbitration provision; and even if defendants could invoke the arbitration provision, it was narrowly crafted and did not embrace the present disputes. In any event, plaintiff argued, the nonsignatory defendants had waived any right to invoke the arbitration clause—they filed their motion more than seven months after this action was commenced. Mr. Evans presented a brief one and one-quarter page declaration which states in part: "I was principally involved with [Mr. Mayor and Mr. Pless] in the negotiation and drafting of the [strategic relationship agreement], which includes a narrowly-crafted arbitration clause. . . . By including the arbitration provision in the [strategic relationship agreement], my intent was to provide a mechanism by which to resolve disputes between my company, the [p]laintiff herein, and [RAP Technology], the other signatory to the [strategic relationship agreement], concerning the performance and interpretation of the [strategic relationship agreement]. [¶] . . . At no time during our negotiations in or about April 2004 did either [Mr.] Mayor, [Mr.] Pless or myself consider or discuss whether the·arbitration provision would apply to claims that either [p]laintiff or [Rap Technologies] might have against third parties that had engaged in tortious conduct that result[ed] in damage to or destruction of my company or [Rap Technologies]. Moreover, at no time during our negotiations in or about April 2004 did we consider or discuss whether the [strategic relationship agreement] was designed to benefit any person other than [plaintiff] and [Rap Technologies]." ·

The trial court denied defendants' motion to compel arbitration. The trial court was persuaded by two Ninth Circuit Court of Appeals decisions—*Tracer Research v. Nat. Environ. Services Co., supra*, 42 F.3d at pages 1294–1296, and *Mediterranean Enterprises, Inc. v. Ssangyong, supra*, 708 F.2d at pages 1464–1465. The trial court found plaintiff's claims did not arise "from or out of" the strategic relationship agreement in that: they did not require interpretation of the strategic relationship agreement; they did not require an examination of performance under that contract; and all of the allegations had to do with defendants' alleged conversion of the Loan Vibe software program, RAP Technologies's principal corporate asset. Therefore, the trial court ruled plaintiff's causes of action were not subject to arbitration. The trial court further ruled: "As a result of the Court's analysis regarding the scope of the arbitration provision at issue, the Court need not reach the questions of whether non-signatory defendants may rely upon the arbitration provision and whether defendants have waived any right to rely thereon through dilatory and bad-faith conduct. Because the scope of the arbitration clause's language is not broad enough to encompass Plaintiff's claims herein, the Court denies Defendants' motion to compel arbitration and to stay this litigation." The trial court also did not rule on defendants' evidentiary objections. As a result, those objections have been waived. (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186, fn. 1 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on another point in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493] [summary judgment]; *Goodale v. Thorn* (1926) 199 Cal. 307, 315 [249 P. 11] [trial]; *City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 782–785 [97 Cal.Rptr.2d 140] [summary judgment]; *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 698 [39 Cal.Rptr. 64] [trial].)

## III. DISCUSSION

### A. The United States Arbitration Act

The arbitration clause specifically provides, "The interpretation and enforcement of this Agreement shall be governed by California Law as applied to residents of the State of California relating to contracts exercised in and to be performed solely within the State of California." Therefore, the limited preemptive aspects of the United States Arbitration Act, title 9 United States Code section 1 et seq., do not apply. (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 470 [103 L.Ed.2d 488, 109 S.Ct. 1248]; *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 380 [25 Cal.Rptr.3d 540, 107 P.3d 217].) Although this case is not subject to the limited preemptive effect of the United States Arbitration Act, California law incorporates many of the basic policy objectives contained in the federal

arbitration statutes including the presumption in favor of arbitrability. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971–972 [64 Cal.Rptr.2d 843, 938 P.2d 903]; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323 [197 Cal.Rptr. 581, 673 P.2d 251].)

### B. The Arbitration Agreement Extends To The Present Dispute

The question before us is whether the strategic relationship agreement's arbitration clause extends to the dispute described in plaintiff's second amended complaint. Whether there is an agreement to arbitrate the present controversy turns on the language of the arbitration clause. (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal.Rptr.2d 809]; *Valsan Partners Limited Partnership v. Calcor Space Facility, Inc.* (1994) 25 Cal.App.4th 809, 817 [30 Cal.Rptr.2d 785].) There is no dispute as to the language of the arbitration clause. As will be noted, there is no relevant conflicting extrinsic evidence as to its terms. We thus conduct a de novo review of the arbitration clause. (*Hotels Nevada, LLC v. Bridge Banc, LLC* (2005) 130 Cal.App.4th 1431, 1434 [30 Cal.Rptr.3d 903]; *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 551–552 [21 Cal.Rptr.3d 322]; *Coast Plaza Doctors Hospital v. Blue Cross of California, supra*, 83 Cal.App.4th at p. 684.)

 Code of Civil Procedure section 1281.2 provides in part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court *shall order* the [parties] to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ." (Italics added.) This language is mandatory. (*Coast Plaza Doctors Hospital v. Blue Cross of California, supra*, 83 Cal.App.4th at p. 687; *Cole v. Antelope Valley Union High School Dist.* (1996) 47 Cal.App.4th 1505, 1511–1513 [55 Cal.Rptr.2d 443].) There is no public policy requiring persons to arbitrate disputes they have not agreed to arbitrate. (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744 [222 Cal.Rptr. 1, 710 P.2d 833]; *Bono v. David* (2007) 147 Cal.App.4th 1055, 1063 [54 Cal.Rptr.3d 837]; *Medical Staff of Doctors Medical Center in Modesto v. Kamil* (2005) 132 Cal.App.4th 679, 684 [33 Cal.Rptr.3d 853].) However, California has a strong public policy in favor of arbitration. (*Engalla v. Permanente Medical Group, Inc., supra*, 15 Cal.4th at pp. 971–972; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].) Given that strong public policy, any doubt as

to whether plaintiff's claims come within the arbitration clause must be resolved in favor of arbitration. (*Coast Plaza Doctors Hospital v. Blue Cross of California, supra,* 83 Cal.App.4th at p. 687; *Hayes Children Leasing Co. v. NCR Corp.* (1995) 37 Cal.App.4th 775, 788 [43 Cal.Rptr.2d 650].) The Court of Appeal has held, "This strong public policy has resulted in the general rule that arbitration should be upheld 'unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute. [Citation.]' (*Bos Material Handling, Inc. v. Crown Controls Corp.* (1982) 137 Cal.App.3d 99, 105 [186 Cal.Rptr. 740] . . . .)" (*Coast Plaza Doctors Hospital v. Blue Cross of California, supra,* 83 Cal.App.4th at p. 686; accord, *Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 1315 [231 Cal.Rptr. 315].) The burden is on the plaintiff, the party opposing arbitration, to show that the arbitration clause cannot be interpreted to cover the claims in the second amended complaint. (*Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, 1406 [18 Cal.Rptr.3d 215]; *Coast Plaza Doctors Hospital v. Blue Cross of California, supra,* 83 Cal.App.4th at pp. 686–687.)

In considering the language of the strategic relationship agreement's arbitration provision, we apply the ordinary rules of contract interpretation. (*Hotels Nevada, LLC v. Bridge Banc, LLC, supra,* 130 Cal.App.4th at p. 1435; *In re Tobacco Cases I* (2004) 124 Cal.App.4th 1095, 1104 [21 Cal.Rptr.3d 875].) The Supreme Court has held: " ' "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.,* § 1644), controls judicial interpretation. (*Id.,* § 1638.)' [Citations.] A [contract] provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." [Citation.]' " (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27 [50 Cal.Rptr.3d 597, 145 P.3d 472].) In *Victoria v. Superior Court, supra,* 40 Cal.3d at page 744, the Supreme Court explained: "In determining the scope of an arbitration clause, '[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation].' (*Weeks v. Crow* [(1980)] 113 Cal.App.3d [350,] 353 [169 Cal.Rptr. 830].)"

■ As noted, in response to the motion to compel arbitration, Mr. Pless declared that the parties to the April 15, 2004 strategic relationship agreement did not intend the arbitration clause to apply to tort claims plaintiff or Rap Technologies may have against third parties. Plaintiff contends, without citation to authority, that we must consider the extrinsic evidence as to the parties' intentions. We disagree. When the contractual language is clear, there is no need to consider extrinsic evidence of the parties' intentions; the clear language of the agreement governs. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co., supra,* 40 Cal.4th at p. 27; *People v. Shelton* (2006) 37 Cal.4th 759, 767 [37 Cal.Rptr.3d 354, 125 P.3d 290].)

■ As noted above, the arbitration agreement between plaintiff and RAP Technologies provides in pertinent part: "*Any* dispute or other disagreement arising from or out of this Consulting Agreement shall be submitted to arbitration under the rules of the American Arbitration Association and the decision of the arbitrator(s) shall be enforceable in any court having jurisdiction thereof." (Italics added.) Plaintiff's agreement to arbitrate "[*a*]*ny* dispute or other disagreement" with RAP Technologies is plain, clear, and very broad. (*Coast Plaza Doctors Hospital v. Blue Cross of California, supra,* 83 Cal.App.4th at p. 684.) As Division Three of the Court of Appeal for this appellate district held in *Coast Plaza Doctors Hospital v. Blue Cross of California, supra,* 83 Cal.App.4th at page 684: "It is clear that the parties agreed to arbitrate '*any* problem or dispute' that arose under or concerned the terms of the [agreement]. That contractual language is both clear and plain. It is also very broad. In interpreting an unambiguous contractual provision we are bound to give effect to the plain and ordinary meaning of the language used by the parties. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; Civ. Code, §§ 1636, 1638 & 1644.) We interpret ['*any* problem or dispute'] to mean just what it says." The language "[*a*]*ny* dispute or other disagreement" extends beyond contract claims to encompass tort causes of action. (*Lewsadder v. Mitchum, Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255, 259 [111 Cal.Rptr. 405]; *Crofoot v. Blair Holdings Corp.* (1953) 119 Cal.App.2d 156, 182 [260 P.2d 156].)

The question then becomes whether plaintiff's fraudulent inducement and negligent misrepresentation claims brought on its own behalf against RAP Technologies's former officers, directors, and employee reasonably can be characterized as "arising from or out of" the April 15, 2004 strategic relationship agreement. We further consider whether the causes of action brought on RAP Technologies's behalf, for fiduciary duty breach, interference

with contractual relations, and conversion, can likewise be said to arise from or out of the April 15, 2004 strategic relationship agreement. The Courts of Appeal have construed arbitration clauses similar to the present provision to broadly encompass tort claims having their roots in the contractual relationship between the parties. In *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1002–1003 [119 Cal.Rptr. 130], Division Two of the Court of Appeal for this appellate district considered an action for negligence and fiduciary duty breach arising out of a broker's purchase transaction pursuant to a customer securities brokerage agreement. The arbitration clause of the agreement stated, " 'Any controversy between [the parties] *arising out of or relating to* this contract or the breach thereof, shall be settled by arbitration . . . .' (Italics added.)" (*Id.* at p. 1002.) The Court of Appeal concluded: "The phrase 'any controversy . . . arising out of or relating to this contract . . .' is certainly broad enough to embrace tort as well as contractual liabilities so long as they have their roots in the relationship between the parties which was created by the contract. [Citations.]" (*Id.* at p. 1003.) The Court of Appeal held that when the securities broker ordered margin purchases of currency futures on the brokerage account, those transactions arose out of and were related to the brokerage agreement; therefore, any dispute concerning those purchases arose out of and were related to the agreement. (*Ibid.*)

Similarly, in *Izzi v. Mesquite Country Club, supra,* 186 Cal.App.3d at pages 1315–1317, the Court of Appeal for the Fourth Appellate District, Division Two, considered a fraudulent concealment, statutory and fiduciary duty breach, and negligence class action brought by condominium purchasers against the sellers. The arbitration clause in *Izzi* was spread over two sentences of a paragraph labeled as an attorney fee clause. But the late Associate Justice Marcus M. Kaufman carefully parsed out the controlling arbitration provisions in the clause thusly: "The arbitration clause at issue in this matter provides that '[a]ny such dispute shall be settled by arbitration . . . .' (Italics added.) The words '[a]ny such dispute' are obviously delimited by the language in the preceding sentence, 'any . . . action instituted between Seller and Buyer *in connection with* this Agreement . . . .' (Italics added.)" (*Id.* at p. 1315.) Justice Kaufman described the pertinent legal issue as follows: "Defendants' petition to compel arbitration thus required the trial court to determine whether plaintiffs' tort claims for fraudulent concealment, negligence, and breach of statutory and fiduciary duties arose 'in connection with' the parties' agreement for purchase and sale of the condominium." (*Ibid.*) The Court of Appeal held: "The factual basis for plaintiffs' tort claims in this case persuades us the arbitration clause applies to such claims and the court erred in concluding otherwise. In the first place,

defendants' alleged tort liability for failure to disclose that buyers of condominiums would be subject to assessments to pay for curbs, gutters, sewers, flood control structures and the like would have its roots in the purchaser-vendor relationship created by the purchase and sale contract containing the arbitration clause. (See *Berman v. Dean Witter & Co., Inc.*[, *supra,*] 44 Cal.App.3d [at p.] 1003 [119 Cal.Rtpr. 130].) Indeed, plaintiffs' entire complaint is predicated on the very claim that vital information was intentionally withheld by defendants in the communications between the parties leading up to that agreement. In this regard, the complaint specifically alleges that if plaintiff class members had been aware of the existence of the facts not disclosed by defendants, they would not have entered into the contract." (*Izzi v. Mesquite Country Club, supra*, 186 Cal.App.3d at p. 1316.)

And in *Coast Plaza Doctors Hospital v. Blue Cross of California, supra*, 83 Cal.App.4th at pages 684–687, Division Three of the Court of Appeal for this appellate district held the plaintiff's tort claims against the defendant were not beyond the scope of an arbitration clause in a service agreement. The parties had entered into a service agreement whereby the defendant, a managed health care services provider, would reimburse plaintiff for specified health care services supplied to patient members. (*Id.* at p. 681.) The service agreement's arbitration clause provided, " '*Any problem or dispute arising under this Agreement and/or concerning the terms of this Agreement . . . shall be arbitrated.*' " (*Id.* at p. 681, fn. 2.) The plaintiff alleged the defendant discriminated against it, a small hospital in a less affluent community, by refusing to renegotiate contractual reimbursement rates that were too low. At the same time the defendant renegotiated with large hospitals in more affluent neighborhoods. (*Id.* at p. 682.) The Court of Appeal held the trial court erred in refusing to grant the defendant's petition to compel arbitration. Our Division Three colleagues reasoned: "Coast Plaza's complaint centers around and is clearly based upon the Reimbursement Rates provided for in the Service Agreement and Blue Cross's alleged refusal to renegotiate them in a manner satisfactory to Coast Plaza. It is alleged that such refusal to renegotiate was the result of Blue Cross's intent and purpose of discriminating against and eventually eliminating smaller hospitals in less affluent communities. Coast Plaza also complains that 'Coast Plaza had prospective economic relationships with future Blue Cross patients and their referring physicians.' Coast Plaza claims these relationships with Blue Cross's subscribers were disturbed when Blue Cross declined to renegotiate more favorable rates than those set forth in the Service Agreement. Coast Plaza complains that because it was forced to terminate the Service Agreement with Blue Cross, Coast Plaza now no longer has access to Blue Cross patients. [¶]

These claims unquestionably have arisen under the Service Agreement and are inextricably related to its terms and provisions. . . . [¶] . . . [¶] Certainly, the fact that Coast Plaza's complaint consists of alleged tort causes of action, rather than contractual claims that are directly based on the provisions of the Service Agreement, does not assist Coast Plaza's argument. It has long been the rule in California that a broadly worded arbitration clause, such as we have here, may extend to tort claims that may arise under or from the contractual relationship." (*Id.* at pp. 684–686, fns. omitted.)

In this case, plaintiff alleges defendants defrauded it out of its investment in RAP Technologies and any financial return on its moneys invested in the Loan Vibe software program. Plaintiff further asserts defendants harmed RAP Technologies by diverting the Loan Vibe software program to their own use for their own financial gain. As noted, the second amended complaint alleges the Loan Vibe software program was RAP Technologies's principal asset. None of defendants is a named party to the strategic relationship agreement. But the strategic relationship agreement is the basis for plaintiff's contractual obligations to RAP Technologies and, by extension, to defendants. It is undisputed defendants are RAP Technologies's former officers, directors, and employees. The strategic relationship agreement established and governed plaintiff's relationship with RAP Technologies. The first and second causes of action allege defendants conspired to and did fraudulently induce plaintiff to invest in RAP Technologies; in other words, to enter into the strategic relationship agreement. The third cause of action alleges Mr. Pless negligently represented the facts that induced plaintiff to invest in RAP Technologies; that is, to enter into the strategic relationship agreement. The fourth, fifth, and sixth causes of action allege injury to RAP Technologies. Specifically, it is alleged defendants induced plaintiff to invest via the strategic relationship agreement in RAP Technologies, then absconded with the Loan Vibe software program, and exercised dominion and control over it for their own financial gain. Thus, it is alleged, Mr. Pless, Mr. Mayor, and Mr. Allegra breached their fiduciary duties and loyalty obligations as officers and directors to RAP Technologies. As alleged, defendants' plan to abscond with RAP Technologies's principal asset, the Loan Vibe software program, and to convert it to their own use, hinged on the strategic relationship agreement. In other words, the strategic relationship agreement was the vehicle for investment in the Loan Vibe software program and that transaction permitted defendants' alleged scheme to succeed. In addition, defendants allegedly interfered with the contractual rights and obligations existing between RAP Technologies and plaintiff, which existed because of the strategic relationship agreement. This caused RAP Technologies to be unable to perform its obligations under the strategic relationship agreement.

If plaintiff and RAP Technologies had never entered into the strategic relationship agreement, the present disputes would never have arisen. The second amended complaint is predicated on the claim that but for defendants' fraudulent inducement and deceit, plaintiff would never have entered into the strategic relationship agreement. Moreover, the second amended complaint alleges: Mr. Pless, Mr. Mayor, and Mr. Allegra were acting as RAP Technologies's officers and directors when they participated in the fraudulent conspiracy; Mr. Pless was both a director and chief executive officer of RAP Technologies when he converted its principal asset, the Loan Vibe software program; and defendants were all acting as agents, employees, and representatives of each other and were acting within the course and scope of such agency, employment, and representation, when they engaged in the asserted misconduct. We conclude "[a]ny dispute or other disagreement" necessarily extends to the present controversy. (*Coast Plaza Doctors Hospital v. Blue Cross of California, supra*, 83 Cal.App.4th at pp. 684–687; *Lewsadder v. Mitchum, Jones & Templeton, supra*, 36 Cal.App.3d at p. 259; *Crofoot v. Blair Holdings Corp., supra*, 119 Cal.App.2d at p. 182.) Therefore, the arbitration agreement extends to the disputes alleged in plaintiff's second amended complaint.

As previously explained, the trial court relied on two Ninth Circuit Court of Appeals decisions as the basis for denying the motion to compel arbitration. It is appropriate to examine each decision in some detail. The first case relied upon by the trial court was *Mediterranean Enterprises, Inc. v. Ssangyong, supra*, 708 F.2d at pages 1461–1464. In *Mediterranean Enterprises, Inc.*, the parties executed an agreement to form a joint venture. The plaintiff was invited to bid on a Saudi Arabian construction project. It was expected the defendant would act as the contractor on the Saudi Arabian project. The arbitration clause stated, "Any disputes arising hereunder or following the formation of joint venture shall be settled through binding arbitration pursuant to the Korean-U.S. Arbitration Agreement, with arbitration to take place in Seoul, Korea." (*Mediterranean Enterprises, Inc. v. Ssangyong, supra*, 708 F.2d at p. 1461.) When the contemplated joint venture was never formed, the plaintiff filed suit in federal district court for: contract and fiduciary duty breach; inducing and conspiracy to induce a contract breach; quantum meruit; and conversion.

In *Mediterranean Enterprises, Inc.*, a Ninth Circuit panel limited the scope of the arbitration clause to disputes concerning interpretation or performance under the contract. The Ninth Circuit panel explained: "We interpret 'arising hereunder' as synonymous with 'arising under the Agreement.' The phrase 'arising under' has been called 'relatively narrow as arbitration clauses go.'

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359, 364 (S.D.N.Y. 1966). In *In re Kinoshita & Co.*, 287 F.2d 951, 953 (2d Cir. 1961), Judge Medina concluded that when an arbitration clause 'refers to disputes or controversies "under" or "arising out of" the contract,' arbitration is restricted to 'disputes and controversies relating to the interpretation of the contract and matters of performance.' Judge Medina reasoned that the phrase 'arising under' is narrower in scope than the phrase 'arising out of or relating to,' the standard language recommended by the American Arbitration Association. *Id.*" (*Mediterranean Enterprises, Inc. v. Ssangyong, supra*, 708 F.2d at p. 1464.)

The Ninth Circuit panel then proceeded to apply this analysis to the causes of action in the complaint. The court held that the contract and fiduciary duty breach claims were covered by the arbitration clause as they involved the interpretation and performance of the agreement to form a joint venture. (*Mediterranean Enterprises, Inc. v. Ssangyong, supra*, 708 F.2d at p. 1464.) But as to the contract interference, quantum meruit, and conversion claims, the court held they were distinct from the central conflict over the interpretation and performance of the joint venture formation agreement. (*Id.* at pp. 1464–1465.)

In *Tracer Research*, the second Ninth Circuit opinion relied upon by the trial court, one of the plaintiff's claims was for trade secret misappropriation. (*Tracer Research v. Nat. Environ. Services Co., supra*, 42 F.3d at p. 1294.) Prior to ordering the case arbitrated, the federal district court issued an injunction designed to protect the plaintiff's trade secrets. The district court ruled that the plaintiff would likely prevail on its trade secret claim. The district court then ordered the matter be arbitrated pursuant to an arbitration clause (*Ibid.*) The relevant portions of the arbitration clause stated that " '[i]n the event any controversy or claim arising out of this Agreement cannot be settled by the parties [], such controversy or claim shall be settled by arbitration.' " (*Id.* at p. 1295.) The arbitrators found there was no merit to the plaintiff's trade secret claim. The district court then vacated the injunction without taking any evidence. Relying on the analysis in *Mediterranean Enterprises, Inc.*, another Ninth Circuit panel held the trade secret dispute did not require interpretation of the contract and thus was not arbitrable. (*Ibid.*) As a result, the Ninth Circuit panel held the district court could not vacate the trade secret misappropriation injunction based solely on the arbitration award. (*Id.* at pp. 1295–1296.) The Ninth Circuit panel reasoned as follows: "The misappropriation of trade secrets count of Tracer's complaint is a tort claim. *See* Uniform Trade Secrets Act, Ariz. Rev. Stat. Ann. §§ 44-401 to 44-407. The fact that the tort claim would not have arisen 'but for' the parties'

licensing agreement is not determinative. *See Armada Coal Export, Inc. v. Interbulk, Ltd.,* 726 F.2d 1566, 1568 (11th Cir. 1984). If proven, defendants' continuing use of Tracer's trade secrets would constitute an independent wrong from any breach of the licensing and nondisclosure agreements. *See* Ariz. Rev. Stat. Ann. § 44-407 (statutory tort remedy does not effect contractual remedies, whether or not based on misappropriation of trade secrets). Therefore, it does not require interpretation of the contract and is not arbitrable under *Mediterranean Enterprises.* On remand, that claim should be tried in the district court." (*Tracer Research v. Nat. Environ. Services Co., supra,* 42 F.3d at p. 1295.)

The crucial language in the April 15, 2004 strategic relationship agreement arbitration clause differs from that discussed in the two Ninth Circuit opinions relied upon by the trial court. The critical language in the two Ninth Circuit opinions were "arising hereunder" in *Mediterranean Enterprises, Inc.* and "arising out of this Agreement" in *Tracer Research.* (*Tracer Research v. Nat. Environ. Services Co., supra,* 42 F.3d at p. 1295; *Mediterranean Enterprises, Inc. v. Ssangyong, supra,* 708 F.2d at p. 1461.) By contrast the language in the arbitration clause in this case is materially broader—"arising from or out of"—than that in *Mediterranean Enterprises, Inc.* or *Tracer Research.* Moreover, as we have explained, language of the type at issue here, when broadly construed, has consistently been applied in California opinions to require arbitration of tort claims.

In any event, the foregoing Ninth Circuit analysis no longer finds support in other federal courts. As noted, in *Mediterranean Enterprises, Inc.,* the Ninth Circuit Court of Appeals relied on the Second Circuit's "relatively narrow" reading of the " 'arising under' " language in the case of *In re Kinoshita & Co., supra,* 287 F.2d at page 953. However, the Second Circuit has held that the narrow reading of contractual language in *Kinoshita & Co.* must be limited to its precise facts. (*ACE Capital Re Overseas v. Central United Life* (2d. Cir. 2002) 307 F.3d 24, 26 ["*In re Kinoshita & Co* . . . concluding that the use of the phrase 'arising under' results in a narrow arbitration clause, has been limited to its precise facts"]; *Louis Dreyfus Negoce S. A. v. Blystad Shipping* (2d Cir. 2001) 252 F.3d 218, 225–226 ["In *In re Kinoshita & Co.,* . . . an early decision dealing with the scope of arbitration clauses under the Arbitration Act, we intimated that the use of the phrase 'arising under' an agreement, in an arbitration clause, indicated that the parties intended the clause be narrowly applied. We have, however, since limited this holding to its facts, declaring that absent further limitation, only the precise language in *Kinoshita* would evince a narrow clause"]; accord, *Highlands Wellmont Health v. John Deere Health* (6th Cir. 2003) 350 F.3d 568, 577 ["While *Kinoshita* has not been formally overruled, the Second Circuit has severely limited its application to its precise facts . . ."].) In other cases, Second Circuit panels have explained that *In re Kinoshita & Co.* is

inconsistent with the preference for arbitration of disputes subject to the United States Arbitration Act. (*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.* (2d Cir. 1987) 815 F.2d 840, 854, fn. 6 ["[W]e recognize . . . that *Kinoshita* is inconsistent with the federal policy favoring arbitration . . ."]; *S.A. Mineracao Da Trindade-Samitri v. Utah Intern.* (2d. Cir. 1984) 745 F.2d 190, 194 ["We decline to overrule *In re Kinoshita,* despite its inconsistency with federal policy favoring arbitration, particularly in international business disputes, because we are concerned that contracting parties may have (in theory at least) relied on that case in their formulation of an arbitration provision"].) Other circuits have recognized that *In re Kinoshita & Co.,* the source of the Ninth Circuit rule relied on by the trial court, is inconsistent with the liberal federal policy favoring arbitration. (*Battaglia v. McKendry* (3rd Cir. 2000) 233 F.3d 720, 725 ["*In re Kinoshita & Co.* . . . and cases relying thereon . . . [have] been discredited both in the Second Circuit and in other jurisdictions"]; *Gregory v. Electro-Mechanical Corp.* (11th Cir.1996) 83 F.3d 382, 385 ["To the extent that the cases binding on this Circuit may have left *Kinoshita* intact, we now reject it simply as not being in accord with present day notions of arbitration as a viable alternative dispute resolution procedure"]; *Mar-Len of La., Inc. v. Parsons-Gilbane* (5th Cir. 1985) 773 F.2d 633, 637 ["*Kinoshita* is inconsistent with federal policy favoring arbitration"].) Consistent with the presumption favoring arbitration, other federal circuit courts have broadly construed "arising under" and "arising out of" language in arbitration provisions. (*Battaglia v. McKendry, supra,* 233 F.3d at p. 727 ["when phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction, and are generally construed to encompass claims going to the formation of the underlying agreements"]; *Gregory v. Electro-Mechanical Corp., supra,* 83 F.3d at p. 385 ["arising under" and "arising out of" clauses are broad]; *Sweet Dreams Unlimited v. Dial-A-Mattress Intern.* (7th Cir. 1993) 1 F.3d 639, 641 ["arising out of" arbitration clause language extended to tort causes of action having their genesis in the contract].) The only federal circuit that continues to strictly adhere to the Second Circuit analysis expressed by Judge Medina in *In re Kinoshita, supra,* 287 F.2d at page 953 is the Ninth Circuit.

We decline to follow the Ninth Circuit rule for the following reasons. To begin with, it is a distinctly minority rule. Further, as noted, California courts have repeatedly held that language similar to that in the present arbitration clause requires that the parties arbitrate extracontractual disputes apart from strict interpretation and contract performance questions. (*Coast Plaza Doctors Hospital v. Blue Cross of California, supra,* 83 Cal.App.4th at pp. 684–687; *Izzi v. Mesquite Country Club, supra,* 186 Cal.App.3d at pp. 1315–1317; *Berman v. Dean Witter & Co., Inc., supra,* 44 Cal.App.3d at pp. 1002–1003.) Moreover, under both federal and state law, we are obligated to liberally construe arbitration clauses. (*Moses H. Cone Hospital v. Mercury Constr.*

*Corp.* (1983).460 U.S. 1, 23 [74 L.Ed.2d 765, 103 S.Ct. 927] ["the policy of the [United States] Arbitration Act requires a liberal reading of arbitration agreements . . . ."]; *O'Malley v. Wilshire Oil Co.* (1963) 59 Cal.2d 482, 491 [30 Cal.Rptr. 452, 381 P.2d 188] ["A heavy presumption weighs the scales in favor of arbitrability; an order directing arbitration should be granted 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage' "]; *Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189 [33 Cal.Rptr.2d 188] [" 'arbitration agreements should be liberally interpreted, and arbitration should be ordered unless the agreement clearly does not apply to the dispute in question' "].) Under California law, we cannot give arbitration clauses the " 'relatively narrow' " construction described in *Mediterranean Enterprises, Inc. v. Ssangyong, supra,* 708 F.2d at page 1464. Thus, we believe the language in the arbitration clause at issue—"[a]ny dispute . . . arising from or out of this . . . [a]greement shall be submitted to arbitration"—is broad enough to cover plaintiff's tort claims.

### C. Standing and Waiver

As noted above, the trial court ruled on only one of three issues plaintiff raised in its opposition to the motion to compel arbitration. Plaintiff argued: first, the arbitration provision did not embrace the present dispute (an argument we have rejected); second, the arbitration agreement could not be enforced by the nonsignatory defendants; and third, defendants had waived their right to invoke the arbitration clause by delay in demanding arbitration. The trial court ruled: "As a result of the Court's analysis regarding the scope of the arbitration provision at issue, the Court need not reach the questions of whether non-signatory defendants may rely upon the arbitration provision and whether defendants have waived any right to rely thereon through dilatory and bad-faith conduct. Because the scope of the arbitration clause's language is not broad enough to encompass Plaintiff's claims herein, the Court denies Defendants' motion to compel arbitration and to stay this litigation." The parties assert this case should be remanded to the trial court for consideration of the standing and waiver issues. (See *St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 [8 Cal.Rptr.3d 517, 82 P.3d 727] ["Generally, the determination of waiver is a question of fact"]; *Valley Casework, Inc. v. Comfort Construction, Inc.* (1999) 76 Cal.App.4th 1013, 1020 [90 Cal.Rptr.2d 779] [standing to compel arbitration is ordinarily a question of fact].) We leave these issues in the good hands of the trial court.

## IV. DISPOSITION

The August 28, 2006 order denying the motion to compel arbitration brought by defendants, Robert Pless, Frank Mayor, David Allegra, Janice Doyle, and AIM Group, LLC, is reversed. Defendants are to recover their costs on appeal from plaintiff, EFund Capital Partners. Upon issuance of the remittitur, the trial court is to consider whether defendants, in whole or in part, have standing to invoke the arbitration provision, and, if so, whether they waived their right to invoke the arbitration clause.

Armstrong, J., and Kriegler, J., concurred.