Filed 9/4/13  Goldberg v. The Coggins Co. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STEPHEN GOLDBERG et al.,<br><br>        Plaintiffs and Respondents,<br><br>    v.<br><br>THE COGGINS COMPANY et al.,<br><br>        Defendants and Appellants. | B245236<br><br>(Los Angeles County<br>Super. Ct. No. BC477765) |

        APPEAL from an order of the Superior Court of Los Angeles County.  Mary H. Strobel, Judge.  Affirmed.


        Gartenberg Gelfand Hayton & Selden, Edward Gartenberg and Jason Bluver for Defendants and Appellants.


        Christman, Kelley and Clarke, Matthew M. Clarke and Dugan P. Kelley for Plaintiffs and Respondents.

Defendants and appellants Sanford Coggins (Coggins) and The Coggins Company (Coggins Company) (collectively, defendants) appeal from an order denying their petition to compel arbitration of claims brought against them by plaintiffs and respondents Stephen Goldberg (Goldberg) and Victoria Pynchon (collectively, plaintiffs). Because plaintiffs' claims do not come within the scope of the parties' agreement to arbitrate, we affirm the order denying the petition.

## FACTUAL BACKGROUND

**The parties and the investment services agreement**

Coggins Company is a financial advisory firm, and Coggins is its president. Plaintiffs are a married couple who engaged defendants as their investment advisors. On January 24, 2008, plaintiffs signed an "Engagement of Investment Advisory Services" agreement (the investment services agreement), in which defendants agreed to provide fee-based investment services. The investment services to be provided by defendants included defining plaintiffs' major life goals, analyzing asset allocation, reviewing and selecting investment products, and managing and monitoring plaintiffs' portfolio. The investment services agreement contains no provision for arbitration of disputes.

In February 2008, plaintiffs informed defendants that Goldberg was ending a long-term employment relationship and that he would be receiving approximately $1.1 million from a pension plan maintained by his soon to be former employer. Defendants created a rollover IRA account at Charles Schwab and Company for Goldberg's benefit (Schwab IRA account) in which the pension plan funds could be deposited.

**The first Wildomar investment**

In March 2008, Coggins recommended that plaintiffs invest in an offering involving certain real property in Riverside County, California. The property, called Wildomar Square (Wildomar), was to be developed into a retail shopping center. Defendants did not disclose to plaintiffs that defendants also had an interest in Wildomar that might constitute a conflict of interest. Based on defendants' recommendations, plaintiffs agreed to invest $300,000 in Wildomar. Coggins thereafter sent plaintiffs a private placement memorandum that described the Wildomar investment, which

2

consisted of membership interests in Wildomar Investors, LLC, a California limited liability company that owned a 50 percent interest in Wildomar Square Partners, LLC, a company formed for the purpose of acquiring approximately five acres of land in an unincorporated area of Riverside County. Plaintiffs signed an amended form of the Wildomar private placement memorandum dated June 12, 2008, thereby authorizing defendants to purchase on their behalf a $300,000 interest in Wildomar (Interest No. 1), using funds from a joint living trust account plaintiffs had established at Charles Schwab and Company. The joint living trust account was separate and distinct from the Schwab IRA account established for Goldberg.

On June 20, 2008, approximately $1.3 million was transferred from Goldberg's prior pension fund to his Schwab IRA account. On June 30, 2008, plaintiffs transferred $100,000 from the Schwab IRA account to their joint living trust account and wire transferred $300,000 from their joint living trust account to purchase Interest No. 1.

**The second Wildomar investment**

Within a few days after plaintiffs authorized the purchase of Interest No. 1, defendants advised plaintiffs that there were tax advantages to owning their $300,000 interest in Wildomar in a retirement account rather than through their joint living trust account. Defendants had not raised this issue before plaintiffs had authorized the purchase of Interest No. 1 using funds from their joint living trust account. Coggins told plaintiffs that defendants would either sell Interest No. 1 to a third party or simply roll Interest No. 1 into a second transaction that would enable plaintiffs to hold that interest in a retirement account. Coggins assured plaintiffs that they would own only a single $300,000 interest in Wildomar, and not two such interests.

Defendants represented to plaintiffs that Goldberg's Schwab IRA account could not own real estate assets. They recommended that a second retirement account be established for Goldberg with a custodian that could hold real estate assets. With plaintiffs' approval, defendants opened a second retirement account for Goldberg at Pensco Trust Company (the Pensco account). Defendants then recommended that plaintiffs transfer $300,000 from Goldberg's Schwab IRA account to the Pensco account

in order to purchase a second $300,000 interest in Wildomar (Interest No. 2) as a substitute for Interest No. 1. Defendants assured plaintiffs that Interest No. 2 would be a substitute for Interest No. 1 and not an additional interest in Wildomar. Plaintiffs never agreed to a $600,000 investment in Wildomar.

On July 8, 2008, upon receiving the Schwab statement for their joint living trust account, plaintiffs learned that funds from that account had been used to purchase Interest No. 1. Plaintiffs emailed Coggins asking whether Interest No. 1 would be held by their joint living trust account or within a retirement account as defendants had recommended. On July 29, 2008, Goldberg checked the balance in his Schwab IRA account and discovered that defendants had transferred $301,000 from that account to some other account or location. The Schwab online statement did not indicate where those funds had been sent.

Goldberg emailed defendants on July 30, 2008, and asked for an explanation of the activity shown on the online statement for his Schwab IRA account and whether the $301,000 fund transfer had anything to do with Wildomar. Mickey Payne, Coggins's director of operations, informed plaintiffs that $300,000 had been transferred from the Schwab IRA account to the Pensco account to purchase the Wildomar interest. Goldberg responded to Payne by stating that he was confused by the Wildomar investment and the additional proposed purchase, noting that "it seems that we have paid twice for this investment." Coggins responded on August 1, 2008, by assuring plaintiffs that they "did not pay double for Wildomar."

On August 28, 2008, defendants caused Pensco to purchase Interest No. 2 for the benefit of Goldberg's Pensco account, bringing their total investment in Wildomar to $600,000. On September 8, 2008, Coggins sent an email to "Wildomar Investors" asking them to sign an escrow amendment extending the Wildomar offering to September 18, 2008. The email indicated that plaintiffs were to sign the escrow agreement twice. Goldberg responded to Coggins' email on September 9, 2008, asking whether the $300,000 that had been used to purchase Interest No. 1 had been refunded to plaintiffs' joint living trust account and why they were required to sign the escrow amendment

4

twice if they owned only one interest in Wildomar.  Goldberg reiterated plaintiffs' understanding that they should have only a single $300,000 investment in Wildomar.

Coggins responded on September 8 or 9, 2008, by explaining that he needed to purchase Interest No. 2 in Goldberg's Pensco account and that the transaction was merely an "accounting function."  Based on Goldberg's representations and actions, plaintiffs believed that defendants had either already sold Interest No. 1 to another purchaser or transferred that interest into Goldberg's Pensco account.

On September 29, 2008, plaintiffs wrote Coggins, asking whether they still owned Interest No. 1 *and* Interest No. 2 or just a single interest in Wildomar.  On September 30, 2008, Payne, not Coggins, informed plaintiffs that they owned two interests in Wildomar for a total of $600,000 and suggested that they speak with Coggins regarding the "logistics" of that investment.  The Wildomar investment subsequently failed, and plaintiffs lost $600,000.

**The Wildomar operating agreements**

In connection with the Wildomar offering, plaintiffs executed an operating agreement for Wildomar Investors, LLC (the LLC).  The operating agreement governs management and control of the LLC; allocation of profits, losses, and distributions; and the transfer and assignment of interests, among other things.  It also contains an arbitration provision that provides in relevant part:

> "[A]ny controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration in Los Angeles, California before a retired Superior Court or Court of Appeal judge selected by the American Arbitration Association ('AAA') under the commercial arbitration rules then obtaining of the AAA. . . .  No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by any Member or Manager except (a) an action to compel arbitration pursuant to this Section 14.11 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 14.11."

**The instant lawsuit and defendants' petition to compel arbitration**

Plaintiffs filed the instant action on January 25, 2012, asserting claims for breach of oral and written contract, breach of the covenant of good faith and fair dealing, professional negligence, breach of loyalty and fiduciary duty, concealment and constructive fraud, intentional and negligent misrepresentation, violation of Corporations Code sections 25400 and 25401, unfair competition, and rescission.

Defendants filed a petition to compel arbitration based on the arbitration clause contained in the Wildomar operating agreement.[1] The trial court denied the petition on the ground that plaintiffs' claims regarding defendants' allegedly deceptive investment actions arose out of the investment services agreement, and not the Wildomar operating agreement. The trial court found that because plaintiffs' claims did not arise out of the Wildomar operating agreement, they were outside the scope of the arbitration provision in that agreement. Defendants appeal the denial of their petition to compel arbitration.

## DISCUSSION

### I. Applicable law and standard of review

Before a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving both the existence of a valid arbitration agreement and that the dispute is covered by the agreement. (*Engalla v. Permanente Medical Group, Inc*. (1997) 15 Cal.4th 951, 972.) The question before us is whether the dispute as described in plaintiffs' complaint is covered by the Wildomar operating agreement's arbitration clause. We review that question de novo. (See *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320 (*EFund*).)

---

[1] Defendants also filed a previous petition to arbitrate based on arbitration clauses in the parties' subscription agreements, which the trial court denied on the ground that defendants were not parties to those agreements. Defendants have not appealed the denial of their previous petition to arbitrate.

**II. The instant dispute is not within the scope of the Wildomar operating agreement's arbitration clause**

The arbitration provision in the Wildomar operating agreement states that "any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration . . . ." Defendants argue that the instant dispute comes within the scope of the arbitration provision because the gravamen of plaintiffs' claims is that they would not have invested in Wildomar but for defendants' allegedly inaccurate representations.

The Wildomar operating agreement concerns the formation of an LLC to acquire an ownership interest in land to be developed, management of the LLC, and allocation of profits, losses, and distributions associated with the development. Plaintiffs' claims against defendants for breach of contract, professional negligence, breach of fiduciary duty, fraud, misrepresentation, and other alleged misdeeds do not arise out of the LLC or the conduct of the LLC's manager or any of its members. Rather, they are premised on defendants' acts and omissions as plaintiffs' investment advisors and breaches of duties and obligations owed to plaintiffs under the investment services agreement.

In their causes of action for breach of contract, plaintiffs specifically allege that defendants breached the investment services agreement by advising them to invest in a high risk venture, by purchasing two $300,000 interests in Wildomar even though plaintiffs never intended to purchase more than a single interest, and by failing to communicate with plaintiffs regarding the status of their investments and the terms and conditions of the Wildomar investment. In their breach of fiduciary duty, professional negligence, and fraud causes of action, plaintiffs allege that defendants breached duties and standards of care owed to them as plaintiffs' financial advisors by failing to disclose that defendants themselves owned a 15 percent interest in Wildomar and by misleading plaintiffs into purchasing two $300,000 interests in Wildomar when plaintiffs intended to purchase only a single interest.

Plaintiffs' complaint contains no allegations of mismanagement or fraud by the Wildomar LLC or its manager, or of any breaches of the Wildomar operating agreement. None of plaintiffs' claims arise out of the Wildomar operating agreement or the interpretation of any of its provisions. Plaintiffs' complaint seeks to vindicate rights created by the investment services agreement, not the Wildomar operating agreement. Because the Wildomar operating agreement does not form the basis of plaintiffs' complaint, the arbitration provision contained within that agreement does not cover this action. (*Marsch v. Williams* (1994) 23 Cal.App.4th 250, 257 (*Marsch*).)

The circumstances presented here are similar to those in *Marsch*. In that case, the parties had entered into separate partnership agreements concerning two different real estate projects in La Jolla and in Rancho Santa Fe, California. The Rancho Santa Fe agreement contained an arbitration clause, whereas the La Jolla agreement did not. (*Marsch, supra*, 23 Cal.App.4th at p. 252.) The plaintiff in *Marsch* filed two separate actions, the first seeking damages for breach of contract, breach of fiduciary duty, fraud, and other tortious acts based upon the defendant's conduct in the Rancho Santa Fe partnership, and a second subsequent action seeking damages for the same causes action based on the defendant's conduct in the La Jolla partnerships. The defendant successfully petitioned to compel arbitration of the Rancho Santa Fe action, but not the La Jolla action.

In denying the petition to compel arbitration of the La Jolla action, the court in *Marsch* rejected the defendant's arguments that the arbitration clause contained in the Rancho Santa Fe agreement, which required arbitration of "any controversy . . . arising out of or relating to the contract . . ." was "sufficiently broad to include tort, as well as contractual liabilities so long as the tort claims 'have their roots in the relationship between the parties created by the contract'" (*Marsch, supra*, 23 Cal.App.4th at p. 255, italics omitted), and that the La Jolla claims were rooted in the relationship created by the Rancho Santa Fe agreement because the plaintiff alleged that the defendant's conduct in the Rancho Santa Fe partnership undermined operation of the La Jolla project. (*Id.* at pp. 255-256.) The court in *Marsch* noted that the La Jolla and Rancho Santa Fe agreements

"were not closely connected in purpose, did not incorporate one another's terms, were not executed at the same time" and that breach of one of the agreements did not necessarily lead to breach of the other. (*Id.* at p. 256.) The court concluded that because the parties had created "separate contractual relationships, which involve separate enterprises and most importantly separate commercial risks, an arbitration clause which governs one contractual relationship cannot be imposed in the other relationship without undermining the parties' reasonable expectations." (*Ibid.*)

The same is true in the instant case. The investment services agreement and the Wildomar operating agreement involved separate enterprises, separate risks, and separate contractual relationships. Because plaintiffs' complaint seeks redress only under the investment services agreement, the arbitration provision in the Wildomar operating agreement does not apply.

*EFund* on which defendants rely as support for their position, is inapposite. The court in *EFund* addressed the scope of an arbitration clause contained within a contract that formed the basis of the plaintiff's complaint. The plaintiff in *EFund* entered into an agreement with RAP Technologies regarding acquisition of an equity interest in RAP. The plaintiff later sued RAP's officers for fraud, alleging they had engaged in self-dealing. In finding that the claims were subject to arbitration, the court in *EFund* held that the broadly worded arbitration clause, requiring arbitration of "[a]ny dispute or other disagreement arising from or out of this Consulting Agreement" encompassed not only contract claims, but also "tort claims having their roots in the contractual relationship." (*EFund, supra*, 150 Cal.App.4th at pp. 1322, 1323.) The court reasoned that the parties' agreement "established and governed plaintiff's relationship with RAP Technologies" and was the basis for the parties' contractual obligations to one another. (*Id.* at p. 1325.)

This is not the case here. Unlike *EFund*, the parties here entered into separate agreements that establish separate contractual relationships that govern separate enterprises and impose separate and distinct contractual obligations. The Wildomar operating agreement does not govern defendants' duties and obligations as plaintiffs'

9

investment advisors and is not the subject of plaintiffs' claims in this case. The arbitration clause contained in that agreement does not govern this dispute.

**DISPOSITION**

The order denying the petition to compel arbitration is affirmed. Plaintiffs are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.*
FERNS

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.