Filed 5/5/22  Kothari v. Desai CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MIRA KOTHARI et al., | |
| Plaintiffs and Respondents, | G060312 |
| v. | (Super. Ct. No. 30-2020-01165171) |
| ASHOK DESAI et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order the Superior Court of Orange County, Ronald L. Bauer, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

CDF Labor Law, Dan M. Forman and Linda Wang for Defendants and Appellants.

John L. Dodd & Associates, John L. Dodd; Law Office of George Moschopoulos and George Moschopoulos for Plaintiffs and Respondents.

\*        \*        \*

Mira Kothari and Christian Michel filed a civil lawsuit against Ashok Desai and his limited liability company, MBKV (collectively referred to as Desai, unless context requires otherwise). In this appeal, Desai challenges the trial court's decision to deny his motion to compel arbitration. He maintains the dispute falls within the scope of the limited liability company's (LLC) operating agreement's arbitration provision. Desai argues this agreement binds Kothari, who is a member of the LLC, and Michel, who is a nonsignatory beneficiary, to arbitrate their entire dispute. We conclude his contentions lack merit, and we affirm the court's order.

FACTS[1]

In 2020, Kothari and Michel, a married couple, filed a complaint representing a "four part dispute arising out of business operations and ownership" of MBKV, doing business as Popwhite. (Underline omitted.) In addition to damages, they sought restitution, an order imposing a constructive trust over the LLC, an order clarifying the various membership interests in the LLC, an accounting, punitive damages, and attorney fees and costs.

Before discussing the nature of the four disputes, it is helpful to understand the relationship of the parties and some details about their backgrounds. Desai and his wife raised Kothari from the age of four years old until she was 12. After she left their home, they "maintained a close familiar relationship with one another" and Kothari viewed Desai "as a father figure." Kothari alleged Desai acted as her mentor and "encouraged her to follow in his footsteps as a business owner and entrepreneur."

---

[1] We limit our summary of the facts to those set forth in the complaint. (*Rice v. Downs* (2016) 248 Cal.App.4th 175, 185 [whether an arbitration agreement applies to a specific dispute requires the court to examine only the agreement and the allegations of the complaint].)

Kothari earned a degree in economics from Harvard University, and a law degree from Stanford University. After passing the New York bar examination, she began working as a lawyer in New York, emphasizing in transactional work and entertainment law. In 2011, Kothari decided she wanted to pursue a career as a talent agent in the entertainment industry. In preparation, she secured a sales job and routinely traveled to California. Consequently, she began living "on a part-time basis with her beloved extended family, [Desai] and his wife, in Orange County while she was traveling."

I. *The Business Opportunity*

The complaint stated Desai encouraged Kothari to follow his career path and he did not support her goal of becoming a Hollywood talent agent. In 2012, Desai invited Kothari "to be part of an opportunity" that would enable her to gain "financial freedom" as an entrepreneur. He told Kothari about a new business opportunity relating to a patented cosmetic dental paste used to whiten teeth. He asked her to meet with the patent holder and negotiate a deal. Kothari alleged she "decided to pursue the opportunity as she saw it as a 'father-daughter moment' . . . ." In addition, she heard Desai promise that in exchange for her help he would "grant co-founder equity" to her in the new business and would pay for her time, albeit at a significantly discounted rate.

Kothari traveled to Utah, where she conducted due diligence, negotiated a sales deal, interacted with the seller's "team of outside counsel," and drafted two agreements. In addition to an asset purchase agreement, she drafted a transition services agreement (TSA), paying Mike LaDow $10,000 per month to oversee the transition of the patent owner's business to Desai's newly formed LLC (MBKV dba Popwhite). In addition to the value of her consulting/legal services Kothari contributed money to the newly formed LLC.

3

II. *The LLC Operating Agreement*

Desai asked Kothari to draft the LLC's operating agreement (LLC Agreement). He indicated the document should reflect Kothari held a 5 percent membership interest. Kothari followed his instructions and drafted the LLC Agreement containing the following provisions: (1) Desai was the designated "member-manager" and contributed $90,000 for a 22.5 percent interest in the company; (2) Desai's wife made the same capital contribution for a 22.5 percent interest in the company; (3) two members each contributing $80,000 were allotted 20 percent interest; and (4) three members (including Kothari) made capital contributions of $20,000, and each received a 5 percent interest in the LLC.

The last section of the LLC Agreement, titled "General Provisions" included nonbinding mediation and nonbinding arbitration provisions. It set forth the parties' agreement as follows: "4. Mediation and Arbitration of Disputes Among Members. If any dispute over provisions of this Agreement or other disputes relating to the LLC among members arises and such members cannot resolve such dispute . . . the matter shall be submitted to mediation. . . . If good-faith mediation of a dispute proves impossible . . . the dispute shall be submitted to arbitration in accordance with the rules of the American Arbitration Association [(AAA)]. Any party may commence arbitration . . . by sending a written request for arbitration to all the parties to the dispute. . . . [¶] All parties shall initially share the cost of arbitration, but the prevailing party . . . may be awarded attorney fees, costs and other expenses of arbitration. If the member parties to such dispute agree in advance, the arbitration decision shall be final binding, and conclusive on all the parties to arbitration . . . ." (Bold omitted.) The LLC Agreement became effective on December 1, 2012.

4

III. *Additional Consulting/Legal Services*

A few months after the LLC's formation, Desai asked Kothari to handle a dispute regarding the TSA and LaDow. Although Kothari had not yet relocated to California on a full-time basis, she agreed to perform additional services for the LLC for a discounted hourly rate. After terminating LaDow, she "temporarily assume[d his] responsibilities" outlined in the TSA. Desai hired Robert Noble to replace LaDow, but soon grew dissatisfied with Noble's performance and again asked Kothari to step in and help. Kothari alleged in the complaint that because she was being paid a discounted rate, she was compensated less than LaDow and Noble for performing the same duties. However, she continued working with the understanding she was a co-founder of the LLC and Desai would increase her equity share in the business.

In 2014, Kothari and Michel permanently relocated to Orange County. Kothari was still trying to become a talent agent, but she was also working part time for the LLC. Kothari submitted two invoices ($36,045 and $6,745) for her services. The complaint stated that when the LLC "was slow to pay," Kothari told Desai she was "beginning to feel she was being taken advantage of because in addition to not being timely paid for her discounted services, [Desai] was also not producing the documentation finalizing her full ownership interest in [the LLC] as a co-founder." The complaint alleged Desai assured Kothari that she could trust him, and she would be paid the total amount owed ($42,790) for her consulting services after the LLC started generating revenue.

IV. *Employment*

In addition to promising to pay for past consulting services, Desai convinced Kothari to give up her career plans and start working full time for the LLC. Kothari alleged Desai told her it was "the best way she could preserve her initial $20,000 investment [while] maximizing her chance of payment on her two [unpaid] invoices."

5

Kothari alleged she had several reasons for being apprehensive about working for the LLC, including that it "lacked the proper infrastructure to successfully bring its product to market."

Kothari agreed to work for the LLC only if Desai agreed to execute a separate written contract promising to (1) to pay the past due invoices, (2) "document her co-founder equity," (3) hire Michel as a full-time employee to help the LLC become operational, (4) grant Michel co-founder equity in the LLC; and (5) pay Michel and herself a monthly salary. As will be described in more detail below, Desai agreed to a written contract outlining three of the five proposed terms.

Kothari and Michel attached to their complaint a two-page contract, executed by the parties on June 2, 2015 (Employment Agreement). It provided the LLC would pay Kothari $2,000 every two weeks, and the LLC represented it had "the cash flow to fulfill payment" for at least six months from the start day. Similarly, the LLC agreed to pay Michel a salary of $1,500 every two weeks for at least six months. The salary would be renegotiated after six months. In the complaint, Kothari and Michel alleged they accepted salaries lower than market value benchmarks only because Desai again promised them co-founder status with additional equity in the LLC. However, the Employment Agreement did not memorialize Desai's purported promise to compensate Kothari and Michal with additional shares in the company.

As for the outstanding consulting invoices, the Employment Agreement stated the LLC agreed to pay $5,000 immediately, and thereafter, make monthly installment of 10 percent of the LLC's gross revenue. In the event the LLC failed to pay Kothari in full by March 30, 2015, Desai personally guaranteed payment of the balance (up to a maximum of $20,000) no later than November 30, 2015. If more was still owed after this November deadline, the LLC agreed to continue making payments based on the 10 percent gross revenue share formula until everything was paid in full. In addition, the

6

contract gave Kothari the option of asking Desai to buy back her "outstanding equity" in the LLC "at the original cost price of $10,000" and time was of the essence.

Kothari and Michel asserted that when they started working for the LLC, the inventory was expiring, there were no significant sales, and there was no established supply chain. Kothari assumed the role of chief operations officer. Michel "had years of experience in sales, marketing, web design and search engine optimization and search engine marketing. He assumed the role of chief distribution officer. The complaint contained a lengthy list of their positive contributions to the LLC. It also noted Desai referred to Kothari as the "founder and mastermind of the operation" and he would tell third parties "the entire brand" was her vision. The LLC's marketing materials, business plans, and sale materials listed Kothari and Michel as co-founders.

After six months of developing and growing the business, Kothari and Michel requested "finalization of their agreed upon co-founder equity." The complaint alleged Desai made excuses and created delays, hiding that "he never had any real intention" of keeping his promise.

By the end of 2018, Kothari and Michel had been working at reduced salaries for four years and they claimed to have made "countless requests for finalization of their respective equity percentages." They alleged Desai conceded "he had been grossly dilatory and that he would make good on his long overdue promises to grant each of them their corresponding co-founder equity."

In January 2019, Desai hired a law firm to finalize the paperwork needed to transition the LLC from a California to a Delaware entity. Desai started this transition process two years prior with a different attorney, however, Desai failed to complete the necessary documents. Kothari and Michel claimed they interpreted Desai's decision to hire a new attorney as an indication Desai was ready to create new governance documents reflecting the promised additional co-founder equity shares. As it turned out,

7

Desai never provided the new law firm with the necessary documents and capitalization schedule.

In early 2019, the LLC failed to pay Kothari her salary. Kothari asked Desai about her compensation and he replied, "'you're an owner and as an owner you have to assume the risk of not getting paid.'"

In June 2019, Desai hired Hark Vasa as the LLC's chief financial officer. As part of his compensation package, Vasa demanded an equity share in the company. Desai not only agreed to this request, but also facilitated the official reallocation of membership interests within two weeks. Kothari and Michel viewed this development as the final straw, claiming it made them finally understand Desai never intended to give them co-founder equity. In September 2019, they "made a firm written demand that if they did not receive their corresponding equity they would not continue forward with their full time employment and management" duties at the company. Within hours, Desai terminated their employment.

V. *Post-termination*

After his termination, Michel gave Desai all the login credentials and information needed to operate the LLC's online accounts and Web sites. A few months later, in January 2020, Michel received "a flurry of alerts of new logins to his personal electronic accounts by others, from new machines and new locations . . . ." He learned some of his domain names, registered for businesses unrelated to the LLC, were transferred to a third party. He later discovered the person behind this invasion of his privacy was Desai's newly hired employee, Natasha Mosakowski.

The complaint alleged Desai instructed Mosakowski to access Michel's private Facebook accounts, four Gmail accounts, a GoDaddy account, and a webhosting account at HostGator. Michel alleged this incident triggered unsolicited calls from lenders which led him to believe it was necessary to freeze his credit.

8

VI. *The Complaint*

      A. *Part One—Contractual Claims*

The complaint described the first part of the dispute as arising out the LLC's refusal to pay Kothari for her consulting/legal services, which Desai personally guaranteed (*Contractual Claims*). Three causes of action relate to this part of the complaint as follows: (1) breach of contract (Employment Agreement); (2) account stated; and (3) open book account. Kothari explained these causes of action related to the Employment Agreement's terms, attached to the complaint as exhibit A. Specifically, Kothari stated she was owed a total of $42,790 for her consulting services. She added Desai personally guaranteed payment up to $25,000.

      B. *Part Two—LLC Membership Interest Claims*

The second part of the dispute concerned Kothari and Michel's claim they were repeatedly promised, for seven years, that they would be granted a larger equity share in the LLC. This unfulfilled promise was the basis for the following causes of action: (1) fraud (false promise); (2) negligent misrepresentation; (3) constructive fraud; (4) constructive trust; (5) unjust enrichment; (6) accounting; (7) breach of contract (Employment Agreement); (8) breach of the implied covenant of good faith and fair dealing; (9) breach of contract (oral); (10) breach of contract (implied in fact); (11) conversion; (12) declaratory relief; and (13) violation of Business and Professions Code section 17200. The complaint alleged that in reliance of Desai's false promises, Kothari and Michel "took [the LLC] from essentially a mere concept to an established brand in the cosmetic dentistry market, working tirelessly full time for [the company] for below market salaries in hopes of realizing the value of their efforts through their promised co-founder equity, namely at least a 22.5[ percent] membership interest in [the LLC] to each of them."

9

C. *Part Three—Wrongful Termination Claims*

The complaint described the third part of the dispute as relating to wrongful termination of employment. Specifically, the 17th cause of action alleged Desai failed to pay appropriate wages (Lab. Code, §§ 201, 202, & 218) and the 18th cause of action alleged he wrongfully retaliated when informed about the wage violation by terminating employment (Lab. Code, § 1102.5). The 19th cause of action was for wrongful termination in violation of public policy. It alleged Kothari and Michel "worked for nearly five years . . . at far below market salaries based on their agreement with Desai that they would each receive co-founder equity, at least 22.5 [percent] each, in [the LLC] in exchange for working at those reduced salaries."[2] They were terminated within hours of demanding the LLC "convey to them their long promised and overdue wages, namely their co-founder equity."

D. *Part Four—Privacy Claim*

The final part of the dispute related to Desai's "unlawful conduct as to Michel following his ouster and wrongful termination." Michel alleged the LLC "acting through Desai and others violated Michel's privacy rights when they unlawfully accessed [his] personal and password protected e-mail, social media, and other electronic accounts."

E. *Damages*

The final section of the complaint contained a detailed explanation of the substantial financial losses suffered as a result of Desai's wrongful conduct. It also alleged the LLC was the alter ego of Desai, equally responsible for damages.

_____

[2] For ease of reading, some formatting (such as boldface or capitalization) has been omitted from our quotations from the complaint, documentary evidence, and briefing.

VII. *Motion to Compel Arbitration*

Desai's motion to compel arbitration asserted the LLC Agreement's arbitration provision broadly covered all disputes between LLC members, and therefore, the court was required to compel the parties to arbitrate their dispute. He characterized the lawsuit was being "a commercial dispute over commercial loans and the ownership of 45 [percent] of the equity of an LLC that operates under the Agreement." He maintained the arbitration provision covered Kothari and Michel's disputes about "equity ownership, new members, member compensation, sharing of costs, [and the] allocation of profits and losses." Desai conceded Michel was not an LLC member but maintained that nevertheless Michel was bound to the arbitration agreement as a third party beneficiary, because he wanted to benefit from the LLC Agreement as a new member.

Desai added Kothari and Michel waived their right to object to arbitration because they requested mediation before filing their lawsuit. He claimed it was significant Kothari and Michel initially demanded nonbinding mediation and that they cited to the LLC Agreement's alternative dispute resolution provisions.

Desai also argued the LLC Agreement was governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.; FAA) under which all of the claims were subject to arbitration. Citing to California law, he maintained Code of Civil Procedure section 1281.4 required a mandatory stay of the action until the arbitration completed.[3] On a final note, Desai asserted there were no grounds to revoke the LLC agreement because the terms were not procedurally or substantively unconscionable. Desai filed a declaration in support of the motion, as well as a copy of the LLC Agreement.

---

[3] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

11

Kothari and Michel opposed the motion, asserting that although Kothari was a minority member of the LLC, and a party to the LLC Agreement, the gravamen of the lawsuit related to breaches of the Employment Agreement and oral agreements. They argued the LLC Agreement was executed several years before the Employment Agreement and "well before any of the parties contemplated the employment relationships out of which the majority of this dispute arises." Indeed, Michel maintained he did not see a copy of the LLC Agreement until after Desai terminated his employment.

Alternatively, Kothari and Michel argued the LLC Agreement's arbitration provision unconscionable because it did not satisfy the requirements of employment-related arbitration agreements set forth in *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83. In addition to discussing what was required for a valid arbitration agreement governing employment relationships, they asserted Michel was not a LLC member and he was unaware of the arbitration provision located in the company's operating agreement. Michel only agreed to the terms outlined in the Employment Agreement, which did not include an arbitration provision.

Kothari and Michel stated there were other reasons the arbitration agreement should be deemed unconscionable. For example, it failed to specify which version of the AAA's nearly 100 different sets of rules would apply. Kothari and Michel noted there were different rules depending on whether the arbitration was for a commercial dispute versus an employment relationship disagreement. The provision also did not require the arbitrator to prepare a written award, necessary for judicial review in the event the parties agreed to binding arbitration. They also complained that the terms were one-sided and overly harsh, forcing employees to pay attorney fees and costs for unwanted nonbinding arbitration. They argued the arbitration provision, in this respect, was at odds with statutorily imposed procedural and remedial protections granted to employees under Labor Code section 1102.5, regarding fees and costs. Finally, Kothari and Michel argued they would not agree to binding arbitration after their attempts at

12

mediation failed, and the process of advisory arbitration would cause unnecessary expense and delay. They concluded the court should invalidate the entire arbitration provision because it was "permeated with unconscionable provisions."

Desai filed a reply brief, restating his previous arguments. He asserted the court should not be confused by the "screenplay-like adaptation" presented by Kothari and Michel. Desai asserted the 20 causes of action all raised claims of ownership and were subject to the LLC Agreement's arbitration provision.

On May 6, 2021, the court held a hearing and Desai did not request a statement of decision. The court filed a short minute order, simply stating the following: "The [c]ourt hears oral argument. [¶] Motion is denied. [¶] Moving party to give notice."

## DISCUSSION

### I. *Judgment Roll Appeal*

The trial court did not indicate the basis for its ruling. Despite the lack of a statement of decision[4] or a settled statement, Desai elected to bring this appeal on a clerk's transcript, without a reporter's transcript of the hearing. This is commonly referred to as a "judgment roll" appeal. (*Allen v. Toten* (1985) 172 Cal.App.3d 1079, 1082.)

On appellate review, the lower court's judgment is presumed to be correct. (*Taylor v. Nu Digital Marketing, Inc.* (2016) 245 Cal.App.4th 283, 287-288.) ""'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general

---

[4] Section 1291 provides the court must issue a statement of decision if a party makes the request under section 632 before the matter is submitted. (*Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 687 [failure to issue statement of decision is reversable error].)

13

principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." [Citations.]' [Citation.] Where, as here, the appeal is on the judgment roll alone, '[t]he question of the sufficiency of the evidence to support the findings [of the trial court] is not open.' [Citations.] Instead, 'the evidence is conclusively presumed to support the findings, and the only questions presented are the sufficiency of the pleadings and whether the findings support the judgment.'" (*Ibid.*)

We mention the limited record in this appeal for another reason. Desai's opening brief is sprinkled with commentary about what the court purportedly said or relied upon when making its ruling. Some of these speculative statements relate to allegations about perceived trial court errors, which we have disregarded due to the lack of supporting record references. (Cal. Rules of Court, rule 8.204(a)(1)(C) [rule for format and content of briefing].) Thus, we need not address Desai's assertion the trial court made no "attempt to analyze whether it was applying Federal or State law" and erred by failing to apply the FAA. Additionally, there was no reason to consider Desai's unsupported theory the court ruled "without any contractual analysis or factual finding." We have also ignored Desai's bold assertion the court "did not make any finding of fact, nor did it address any findings of evidentiary fact during the hearing" because the minute order simply said the motion was denied. Desai forfeits appellate review of issues or arguments lacking supporting factual references. (*Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5 [in appellate briefs courts may ""'ignore'" factual statements without record references" and "may "'disregard any factual contention not supported by a proper citation to the record'"""].)

II. *Standard of Review*

"Whether there is an agreement to arbitrate the present controversy turns on the language of the arbitration clause. [Citations.] There is no dispute as to the language of the arbitration clause [and] no relevant conflicting extrinsic evidence as to its terms.

14

We thus conduct a de novo review of the arbitration clause." (*EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320 (*EFund*).)

In cases where one party's claim must be arbitrated, while others remain in the civil court for resolution, the court may deny arbitration pursuant to section 1281.2, subdivision (c) (deny motion when risk of inconsistent rulings on common issues such as liability). (*Abaya v. Spanish Ranch I, L.P.* (2010) 189 Cal.App.4th 1490, 1496.) We review this determination for abuse of discretion. (*Ibid.*) "Under this deferential standard of review, 'the trial court's order will not be disturbed on appeal unless it exceeds the bounds of reason.'" (*Ibid.*)

III. *General Rules Regarding Interpretation of Arbitration Agreements*

Section 1281.2 authorizes the trial court to determine whether there is a duty to arbitrate a controversy, which necessarily requires the court to examine and construe the underlying agreement. (*Freeman v. State Farm Mutal Automobile* (1975) 14 Cal.3d 473, 479.) In cases subject to the FAA, courts making this determination "apply ordinary state-law [contract] principles . . . ." (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944.)

Thus, in considering the arbitration provision in this case "we apply the ordinary rules of contract interpretation." (*EFund, supra,* 150 Cal.App.4th at p. 1321.) "'"'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties'"'" and "'[i]n determining the scope of an arbitration clause, "[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation].""'" (*Ibid.*)

15

If the court determines there is a duty to arbitrate a dispute, "section 1281.2 requires a trial court to enforce a written arbitration agreement unless one of three limited exceptions applies." (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 967 (*Acquire*).) "Those statutory exceptions arise where (1) a party waives the right to arbitration; (2) grounds exist for revoking the arbitration agreement; and (3) pending litigation with a third party creates the possibility of conflicting rulings on common factual or legal issues. (§ 1281.2, subds. (a)-(c).)" (*Ibid.*)

Relevant to this appeal, "The third party litigation exception applies when (1) '[a] party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party . . .'; (2) the third party action 'aris[es] out of the same transaction or series of related transactions'; and (3) 'there is a possibility of conflicting rulings on a common issue of law or fact.'" (*Acquire, supra,* 213 Cal.App.4th at pp. 967-968.) "If all three of these conditions are satisfied, then section 1281.2[, subdivision] (c) grants a trial court discretion to either deny or stay arbitration despite an agreement to arbitrate the dispute." (*Id.* at p. 968.) A party opposing a motion to compel arbitration need not present evidence to show he or she is likely to succeed on his claims or defenses; rather, "the question presented is whether a '"possibility"' of conflicting rulings exists [citation] . . . ." (*Id.* at p. 972.)

If none of the statutory exceptions arise and a trial court compels arbitration, "the court action does not disappear and it is effectively held in abeyance until the arbitration 'has been had in accordance with the terms of the agreement.'" (*Weiler v. Marcus & Millichap Real Estate Investment Services, Inc.* (2018) 22 Cal.App.5th 970, 979; citing 9 U.S.C. § 3 & § 1281.4.) Generally speaking, "'The purpose of the statutory stay is to protect the jurisdiction of the arbitrator by preserving the status quo until arbitration is resolved.'" (*Heritage Provider Network, Inc. v. Superior Court* (2008) 158 Cal.App.4th 1146, 1152.) A stay would certainly be required in a case where a defendant forced one of two plaintiffs to participate in nonbinding

arbitration, after which that plaintiff could elect to return to the trial court to adjudicate the matter again.

IV. *Scope of the Agreement*

Desai's briefing focuses on his strongest argument, i.e., the arbitration agreement was broadly written to encompass all possible disputes. We agree Kothari drafted one of the most far-reaching arbitration clauses we have encountered, and we were unable to find any identical case authority to compare it with. The provision requires nonbinding arbitration "among members" not only for disputes arising from the agreement but also all possible controversies broadly "relating to the LLC." Desai concludes Kothari and Michel's ultimate goal in filing the lawsuit was to gain LLC membership interests, which necessarily "relat[es] to the LLC." However, this analysis puts the proverbial cart before the horse. Regardless of the breadth of the contractual language, a plaintiff can only be forced to arbitrate their claim if they are a party bound by the terms of the arbitration agreement.

Accordingly, we begin our analysis by examining Michel's claim he cannot be compelled to arbitrate his contractual and tort claims because he was not an LLC member, he did not sign the LLC Agreement, and was never told his employment status with the LLC was dependent on his willingness to arbitrate. It is undisputed Michel started his employment several years *after* the members formed the LLC. The terms of Michel's employment were outlined in the Employment Agreement, which did not mention arbitration, the LLC Agreement, or a possible equity stake in the LLC. Nevertheless, Desai maintains arbitration is appropriate because if Michel prevailed then he would become an LLC member and directly benefit from the agreement. He is wrong.

"'Arbitration is consensual in nature. . . . Even the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an

17

agreement.'" (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 17.) "'Persons are not normally bound by an agreement entered into by a corporation in which they have an interest or are employees.'" (*Jensen v. U-Haul Co. of California* 18 Cal.App.5th 295, 300 (*Jensen*).) "Nevertheless, there are circumstances under which persons who have not signed an agreement to arbitrate are bound to do so. One treatise has stated that there are 'six theories by which a nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary."' [Citations.] 'The California cases binding nonsignatories to arbitrate their claims fall into two categories. In some cases, a nonsignatory was required to arbitrate a claim because a benefit was conferred on the nonsignatory as a result of the contract, making the nonsignatory a third party beneficiary of the arbitration agreement. In other cases, the nonsignatory was bound to arbitrate the dispute because a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim.'" (*Id.* at pp. 300-301.)

Despite this well-established body of legal authority, Desai offers a novel theory by which a nonsignatory may be bound to arbitrate. He calls it "the direct benefit doctrine." This new theory appears to be a misguided combination of estoppel and third party beneficiary concepts, blended together with a misunderstanding of the case authority. Specifically, Desai apparently fails to appreciate cases involving an unwilling nonsignatory plaintiff differ significantly from those involving a nonsignatory defendant wishing to enforce an arbitration provision against a signer.

Indeed, Desai cites only to inapplicable authority discussing the latter situation. (Citing *Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262, 269; *Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003)

18

109 Cal.App.4th 1705, 1717-1718.)[5] These cases invoke equitable estoppel principles when a *signatory* plaintiff suing a *nonsignatory* defendant on a contract is attempting *to avoid* the arbitration clause. (E.g., *Boucher*, at pp. 271-272.) In this situation, courts have permitted a *nonsignatory defendant* to invoke an arbitration clause when the signatory plaintiff's causes of action are "'intimately founded in and intertwined with'" the contract. The application of equitable estoppel principles precludes a signatory plaintiff, "who sought a direct benefit from the contract," to refuse to comply with the arbitration clause. (*Id.* at pp. 269-270.) The same rules do not apply when a *defendant* signatory is seeking to compel an *unwilling* nonsignatory plaintiff to arbitration. "It is one thing to permit a nonsignatory to relinquish his right to a jury trial, but quite another to compel him to do so." (*Benasra v. Marciano* (2001) 92 Cal.App.4th 987, 991.)

The case before us involves, in essence, an employer (signatory defendant) attempting to enforce an arbitration clause found in the company's equity membership operating agreement, against an unwilling nonmember former employee (nonsignatory plaintiff). The parties have not cited to, nor have we discovered, any authority addressing precisely analogous circumstances. Although Desai asserts, in conclusory terms, that Michel should be treated as beneficiary of the LLC Agreement, there is no evidentiary support for the conclusion he was an intended third party beneficiary.

The phrase third party beneficiary is a legal term of art used to describe persons or entities "'who may enforce a contract because the contract is made expressly for [their] benefit.'" (*Jensen, supra,* 18 Cal.App.5th at p. 301.) "'"The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract. [Citation.] If the

_____

[5] In his reply brief, Desai cited to another case which permitted a nonsignatory defendant to invoke an arbitration clause to compel a signatory plaintiff to arbitrate his claims. (*Garcia v. Pexco, LLC,* (2017) 11 Cal.App.5th 782, 787.) The case is inapt.

19

terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract . . . contemplate a benefit to the third person. The parties are presumed to intend the consequences of a performance of the contract." [Citation.]' [Citation.] . . . [I]t is not enough that the third party would incidentally have benefited from performance. [Citations.] 'The circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement. The contracting parties must have intended to confer a benefit on the third party.' [Citation.] In determining whether the contract contemplates a benefit to the third party, the court must read the contract in light of the circumstances in which the parties entered into it." (*Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 891 (*Souza*).)

Here, the operating agreement set forth all the terms that members of a newly formed LLC would expect. It described the LLC's purpose, duties of the manager member, obligations of nonmanager members, voting rules, meeting guidelines, the addition of new members, and compensation limitations for members. There were administrative related provisions discussing record keeping, dissolution directives, and tax classification. It included an integration clause stating it was "the entire agreement among the members" and replaced all prior agreements. There is no language or evidence, and Desai cites to none, suggesting the members intended to confer a benefit on Michel, who at that time had no involvement in the company. And because Michel was not hired to work for the LLC until three years after its formation, there is no evidence he was otherwise bound by the Agreement under agency principles. (*Jensen, supra,* 18 Cal.App.5th at p. 306.)

We noticed Desai was careful not to refer to Michel as an employee in the briefing, but rather always describes him as a "purported member of the LLC." Desai suggests that because Michel wanted to become a new LLC member, he intended to eventually benefit from the LLC Agreement. Desai argues that by *seeking* equity

20

ownership he could receive benefits impacting "all of the other equity owners of the LLC," and therefore, must be compelled to arbitrate. However, this is not the test used to bind nonsignatory plaintiffs. The question is not what a third party seeks or desires, but rather whether the original contracting parties intended to confer any benefit on the third party. (*Souza, supra,* 135 Cal.App.4th at p. 891.) As discussed earlier, the signing founding members did not make any promises in the LLC's Agreement "which, if performed, would have benefited" Michel. (*Ibid.*)

For this same reason, we reject Desai's theory Michel waived any challenge to the arbitration provision when he demanded mediation because mediation and arbitration were part of the LLC Agreement. The members signing the LLC Agreement did not make any promises to mediate disputes with nonmembers. And as a practical matter, Michel did not need a prior agreement to request nonbinding mediation. Not surprisingly, Desai failed to provide legal authority supporting his theory a plaintiff requesting nonbinding mediation can be compelled to also pay for advisory arbitration, simply because both remedies were included in an agreement he did not sign.

On a final note, although Desai cited to inapplicable cases applying equitable estoppel, we recognize there are unique circumstances where equitable principles have come into play to compel unwilling nonsignator plaintiffs to arbitrate. For example, in *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, a husband, who purchased a professional liability insurance policy, bound his wife to the arbitration clause because she received benefits of the policy by accepting a defense and demanding a litigation settlement. (*Id*. at pp. 77-78.) "The fundamental point" was that a party is "not entitled to make use of [a contract containing an arbitration clause] as long as it worked to [his or] her advantage, then attempt to avoid its application in defining the forum in which [his or] her dispute . . . should be resolved." (*Id.* at p. 84.) There is nothing in the record to suggest Michel ever gained a personal benefit from the LLC Agreement. None of his allegations in the complaint were in any way founded in or

bound up with the terms or obligations of the LLC Agreement. Indeed, all of the causes of action were entirely based on violations of oral promises and the Employment Agreement. It is telling Michel did not find it necessary to even attach a copy of the LLC Agreement to the complaint.

V. *Inseparable Claims*

As part of Desai's "direct benefit" theory argument, he also asserts "Michel's claims are based on the same facts and are inherently inseparable from arbitrable claims between . . . Kothari and Appellants." In raising this contention, Desai perhaps unwittingly answers the next issue we must consider, i.e., did the trial court exercise its discretion to deny arbitration in order to avoid inconsistent results, a remedy authorized under section 1281.2, subdivision (c)?

The record is silent as to the basis for the trial court's ruling, our scope of review is limited, and we must make presumptions in favor of the judgment. Thus, if we assume for the sake of argument (without actually deciding) that Kothari's claims were arbitrable, we must nevertheless affirm the court's ruling as correctly applying section 1281.2, subdivision (c).[6] As mentioned earlier in the opinion, this statutory provision provides an exception to enforcement of an arbitration agreement when the litigation

---

[6] Section 1281.2, subdivision (c) is a procedural rule that applies to motions to compel arbitration brought in California courts, even if the arbitration contract involves interstate commerce governed by FAA substantive provisions. (See *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 388-393; *Judge v. Nijjar Realty, Inc.* (2014) 232 Cal.App.4th 619, 631-632.) The FAA procedural provisions do not apply absent a choice of law provision expressly mandating incorporation. (*Judge, supra,* at p. 631.) The arbitration clause does not mention the FAA or California Arbitration Act (CAA; Code Civ. Proc., § 1280 et seq.). The LLC Agreement has a choice of law provision providing, "The validity, interpretation and legal effect of this Agreement shall be governed by the laws of California . . . ." Because there is no indication the parties intended to apply the procedural provisions of the FAA to the exclusion of those in the CAA, appealability is determined by California law.

22

involves a third party who is not bound by the arbitration agreement. (*RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511, 1519 [defining "third party" for purposes of section 1281.2].) For this exception to apply, the pending court action against the third party must arise "out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact." (§ 1281.2, subd. (c).)

Applying the doctrine of implied findings due to the lack of a statement of decision, we must presume the trial court made all necessary findings supported by substantial evidence in applying section 1281.2, subdivision (c). Our review of the parties' pleadings confirms each plaintiff's claims arise out of a series of related transactions and encounters with Desai and create the possibility of conflicting rulings on common factual and legal issues. For example, Kothari and Michel's decision to work for reduced pay arose from the same discussions with Desai and will require interpretation of the same employment agreement. Their Labor Code and retaliation claims relate to the same working conditions. The complaint shows common factual and legal issues relating to Kothari and Michel's claims of fraud, negligent misrepresentations, constructive fraud, and breach of oral contract because Desai's alleged misconduct related to the same alleged promises/statements, occurring at the same time, and membership interests in the same company. (*Acquire, supra,* 213 Cal.App.4th at p. 972 ["parties' pleadings may constitute substantial evidence sufficient to support a trial court's finding" § 1281.2, subd. (c) applies].) And finally, as mentioned earlier, in the briefing Desai acknowledged Michel's claims "are 'based on the same facts and are inherently inseparable'" from Kothari's causes of action. Because resolution of Kothari's and Michel's allegations in different venues creates the possibility of inconsistent rulings on common questions of law and fact, it cannot be said it was an

23

abuse of discretion for the court to deny the motion to compel pursuant to section 1281.2, subdivision (c).[7]

VI. *Attorney Fees*

Kothari and Michel assert that because they prevailed below and on appeal, they are entitled to an attorney fee award. There are several reasons why we must decline their request to award attorney fees (but without prejudice to raising the issue at a later date before the trial court). First, Kothari and Michel did not submit legal authority holding this court has authority to award fees in the first instance. Second, they did not provide evidence regarding the amount of fees incurred or request a specific amount. Third, their reliance upon *Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515, is misplaced. In that case, while the litigation was pending, one of the parties filed an unsuccessful petition to compel arbitration. (*Id*. at p. 523.) The appellate court reversed the trial court's attorney fee award (made under Civ. Code § 1717) to the prevailing party on the petition. It concluded the petition proceeding, though technically "a preliminary and analytically distinct proceeding in the lawsuit," was not a "distinct action." (*Frog Creek Partners*, *LLC* at pp. 537-543.)

Our case is distinguishable in that the parties did not request fees, the trial court did not award fees, and we do not have enough information in the record to determine with any certainty whether the petition was a distinct action subject to a separate path of appellate review. At this early stage of the proceeding, the parties have offered different opinions about whether there will be a need for further litigation concerning the LLC Agreement. We cannot award fees based on such speculation. Thus, we conclude it would be premature to award fees at this time, and in any event, the matter should be considered and decided by the trial court in the first instance.

---

[7] Having affirmed the court's ruling for the reasons stated, we need not address the parties' alternative argument regarding unconscionability.

24

## DISPOSITION

We affirm the trial court's order denying arbitration.  We deny Respondents' request for attorney fees.  In the interests of justice, each side shall bear their own costs on appeal.


SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.